2003. A search of the Toyota revealed seven (7) kilograms of cocaine concealed in an hidden compartment in the bumper of the vehicle – "3 or 4" of which, I believe, were earmarked for delivery to ROSALES in Lynn, MA as ROSALES and BALBI had discussed earlier. Likewise, the cellular telephone seized from Carmello Rosa after his arrest on December 1, 2003 was the same facility that "Comejen" had been using to communicate with ROSALES in the past.

## 27. November 25, 2003: **MARTINEZ and MADERA**

146. On November 25, 2003, at approximately 6:40 p.m., MADERA called MARTINEZ in Mexico. The two men spoke for almost 20 minutes. Excerpts of their conversation included the following: **1)** MARTINEZ expressed frustration with SACAIDA and his usurping control of the drug organization. MARTINEZ complained to MADERA about SACAIDA's "strange stories" (strategies), and stated that he wasn't listening to SACAIDA anymore and wanted to send "him straight to hell"; **2)** MARTINEZ and MADERA also talked about surviving the next few months with SACAIDA in charge, then "when this is resolved, everyone should go their own way." (Meaning that they could return to their own drug businesses.) MARTINEZ also complained that SACAIDA wanted to "implement a system that's too old and its wrong"; **3)** MARTINEZ also told MADERA that even though SACAIDA was talking about coming back (to Lynn) in December (2003), his "best guess" was that they would be back

126

("we'll take off") by the middle of January (2004); **4)** MARTINEZ stated that if they could do a couple of large deals, they'd be able "to take it easy until the kids grow up...because...you know ...to be at ease"; and **5)** MARTINEZ mentioned a Mexican person, *el Jugador* (the player), who SACAIDA was speaking with about, possibly, the purchase of the 350 kilogram cocaine shipment that SACAIDA had told MADERA and CHON back on November 11, 2003 he was arranging to bring to Lynn on "credit."

**28.   December 8, 2003: ROSALES, Carlos RUIZ, and Ramon ACOSTA**

147. On December 8, 2003, at various times throughout the day, ROSALES spoke with both RUIZ and ACOSTA. During ROSALES' conversation with RUIZ at 2:19 p.m., RUIZ told ROSALES that, "the guys just called me, man...they told me they are having problems over there now and they won't be able to come here until like Friday." As a result, RUIZ asked ROSALES to "see if you can get something for me, man." (Meaning that since RUIZ was not expecting his shipment of cocaine until the following Friday, he needed ROSALES to sell him cocaine to hold him over until the other shipment arrived.) RUIZ also asked ROSALES whether he could get him (RUIZ) "like 2 and 1/2." (Referring, I believe, to 625 grams of cocaine; 1 motor = 250 grams.) They agreed to talk later in the day.

148. At approximately 6:19 p.m., ROSALES and ACOSTA spoke over the telephone. During the call, ROSALES asked ACOSTA if he

127

was "ready." (In other words, ready to sell cocaine to ROSALES.) ROSALES and ACOSTA agreed to speak later. Less than a minute later, ROSALES called RUIZ and told him that he had just "talked to that guy" (ACOSTA), but that ACOSTA wanted ROSALES "to take care of things." RUIZ replied, "cash...how much?" ROSALES replied "with the 7 ($27,00 per kilogram of cocaine)." RUIZ answered, "alright, tell him no problem." ROSALES then confirmed with RUIZ, "so when I give you that...then you..." RUIZ interrupted, "I'll give you the money...I'll have it here with me at the house anyway." ROSALES countered, "it's with the 7...2 *motoras* (engines/motors)." "Yes," replied RUIZ.

149. Later, ROSALES contacted ACOSTA and asked "can you get me 2 *motoras* (motors)?" ACOSTA said, "yes...like in how long will you need them...in about 45 minutes, is that too long?" Based on these exchanges, I believe that ROSALES intended to purchase 500 grams (or 2 *motoras*) from ACOSTA on December 8, 2003 that he would later sell to RUIZ for $27,000 per kilogram and "cash" up front.

## 29.   January 7, 2004: MADERA and ASARO

150. On January 7, 2004 at approximately 12:49 p.m., MADERA called ASARO to collect drug money that ASARO owed him. ASARO told MADERA that he was "ready to go to war" against his customers for not paying what they owed him (ASARO). ASARO told MADERA that he had "$114,000" to collect. MADERA told ASARO not

128

to be so explicit over the phone - "You know we can't talk on the phone like that." MADERA then told ASARO that his guy (supplier) had called him "like 10 times and today...3 times already." ASARO replied, "tell him not to worry, tell him I'm just waiting for the money." MADERA answered, "no, he have to worry because he...has stuff..he has to go, you know...you know how it is." ASARO apologized to MADERA for the delay - I'm sorry buddy for doing this to you...I can't believe what the fuck is going on....I can't even pay my bills...I've got to pay 2 mortgage payments." MADERA responded, "just give me 10, that's all...I pay him, that's all." ASARO answered, "what 10? I only got to give you 85." "That's right," replied MADERA, give me that." (MADERA's request for "10" was a veiled reference to $100,000. Likewise, ASARO's reply that he only owed MADERA "85" indicates that he planned to give MADERA $85,000; an amount that MADERA could, apparently, live with.)

## 30. January 20-21, 2004: MADERA, GERMOSEN and seizure of 9 kilograms of cocaine

151. On January 20, 2004, MADERA spoke with his Connecticut cocaine connection, Roberto Guzman. Guzman told MADERA that "these guys had arrived" and that "they brought two (2) hands (referring to 10 kilograms of cocaine)...and I was going to bring the whole thing to you." When GUZMAN asked MADERA when he wanted them, MADERA replied, "how about in the morning." They agreed to speak the next day.

129

152. On January 21, 2004, at 10:50 a.m. MADERA called Guzman to find out where the drugs were. GUZMAN told MADERA that they were sleeping, he had to get them up, and would call when they were leaving. At 2:56 p.m. the same day GUZMAN called MADERA to say, "are you the enemy...they took the car away from the guy on the way." When MADERA asked "why," GUZMAN replied, "because the (license) plates were expired." When MADERA asked "with everything," GUZMAN replied, "yes." "Oh man!" remarked MADERA.

153.  In a series of calls over the next several hours, MADERA and GUZMAN squabbled over whose fault it was not to have the vehicle properly registered (the registration had expired), bringing the "owner" of the vehicle to Connecticut to claim it from the police, hiring a tow truck to reclaim the vehicle from the police, and, most significantly, what to tell the Mexicans about losing a load of drugs because the car was unregistered. Subsequent conversations involved whether the police had tried to search the vehicle, the exact whereabouts of the vehicle, and whether it would be "dangerous" to go to the police station and attempt to locate the car.  In another conversation between MADERA and the driver of the vehicle (Junior), MADERA received confirmation that police had stopped the car for an expired registration, had seized the car, and directed the driver to have the owner of the car come to the police and claim the vehicle himself.  In another conversation with MADERA, GUZMAN remarked

130

that "I think those people (police) went right where "that" (the drugs) was." MADERA exclaimed, "don't joke around." "Yes," said GUZMAN.  Before hanging up, MADERA remarked, "it's a miracle they (the police) didn't grab him (Junior)."

**Seizure of 9 kilograms of cocaine**

154. On January 21, 2004, Manchester, CT Police (working with Connecticut and Massachusetts DEA) stopped a white VW Jetta (MA Reg. TC60GC; Faustino Cordero, 88 New Park Street, Apt. #2, Lynn, MA) on I-84 northbound and northeast of Hartford, CT.[43][44] The Jetta was operated by a single Hispanic male.  Acting on the aforementioned Title III intercepts, Manchester Police officers were able to identify the white VW Jetta on I-84 and effect a stop of the vehicle.  After talking with the operator, officers discovered that the registration for the white VW Jetta had expired in October of 2003 making this vehicle "unregistered." Based on the illegal registration and suspicions that the white VW Jetta contained cocaine, officers cited the operator and took

_____

[43]  Interestingly enough, ROSALES recently used the license plate from his grey Mercury Sable (US8280), attached it to the black Jeep Cherokee that has been seen parked in the driveway of 83 Story Street, Newburyport, MA and driven by MARTINEZ' wife, Ruth Saldivar, and re-registered the black Cherokee under his name but with the address of "88 New Park Avenue, Lynn, MA" – the same address registered to the white VW Jetta stopped on January 21, 2004 in Connecticut with 9 kilograms of cocaine.

[44]  The operator of the Jetta also provided officers with a printed registration that reflected another address: Faustino Cordero, 499 Boston Street, Apt. #3, Lynn, MA.

possession of the vehicle with the intention of searching it.
After obtaining a state search warrant to inspect the white VW
Jetta from a Connecticut magistrate, officers located nine (9)
kilograms of cocaine hidden in an illegal hide located underneath
the back seat and accessed by hydraulics.

**31.  February 8-12, 2004: MADERA, ASARO, and 56 Hurd Street,
Malden, MA**

155. On February 8, 2004, at approximately 11:55 p.m.,
MADERA and ASARO spoke.  ASARO asked MADERA for a kilogram of
cocaine ("can you get me 1") and promised to pay MADERA in 3 days
("I'll take care of you in 3 days.") MADERA said that he could
not sell ASARO any more drugs until ASARO's preexisting debt to
MADERA was satisfied.  After ASARO explained that one of his
customers was going to pay him "20" ($20,000), MADERA
reconsidered and agreed to sell ASARO his kilogram of cocaine
"the same day" that ASARO was able to satisfy his debt to MADERA.

156.  On February 11, 2004, at approximately 6:31 p.m.,
ASARO called to ask MADERA if he could *still* sell ASARO the
kilogram of cocaine they had discussed on February 8 or whether
ASARO would have to look elsewhere. ("Am I going to see you or
you want me to call my other friend to see if he can help me.")
"Phil," said MADERA, "if you want to call the other friend (about
drugs)...but I need the money for the other guy." (Referring to
ASARO's preexisting debt to MADERA.)  ASARO asked again, "..can
you help me or not."  MADERA replied, "Yeah, I can help you...I

132

don't know, I have to check it." Perplexed, ASARO replied, "I
thought you said...I told you that I was..." "Phil, Phil,"
explained MADERA, "you don't understand...you have to call when
you're there, you can't, you can't, you don't hold it (money) for
2 or 3 days." (MADERA was angry at ASARO for holding money he
owed MADERA and not paying until MADERA could get him the
kilogram of cocaine.)  ASARO said he understood but pressed for
the drugs anyway.  MADERA replied that he had the kilogram but
had to check with "the guy" first (ROSALES).  ASARO said,
"alright you want to come over to my house then?"  MADERA said,
"yeah...okay I'll be there..I'm gonna be there like at 10:00."
ASARO told MADERA to "call me back when you get around (my
house)."  "Okay," said MADERA.

157. At approximately 10:20 p.m., ASARO told MADERA that he
had the "20" ($20,000) to give MADERA as soon as he was ready,
and expected another "10" ($10,000) tomorrow, and that MADERA
could have it whenever he wanted. (Referring to some of the drug
money ASARO owed MADERA.) ASARO asked if MADERA was "ready" for
him. (In other words, if ASARO paid MADERA the "20", was MADERA
ready with the kilogram.) MADERA said that he would see ASARO in
the morning at around "10...11 o'clock."  Before hanging up ASARO
told MADERA that "everyone is starting to pay me little by little
right now...I've got 20, I've got 20, I've got ten tomorrow...so
before you know it, it'll be ...all ready."  On February 12,

133

2004, at 10:59 a.m., ASARO called MADERA to see where he was.
MADERA said that he would see ASARO "like in one hour."  At
approximately 12:09 p.m. ASARO called MADERA to find out how long
he would be.  MADERA said he'd be there in "2 minutes."

**Surveillance of MADERA, GERMOSEN, and 56 Hurd Street**

158. On February 12, 2004 at approximately 12:22 p.m.,
surveillance at 56 Hurd Street, Malden, MA observed Christian
GERMOSEN (driving) and MADERA (passenger) drive onto Hurd Street
in Malden, MA and up to the residence at 56 Hurd Street in a red
Chevrolet Malibu sedan (MA Reg. 4607XC); a vehicle registered to
Maria Pena, 45 Estes Street, Everett, MA.[45]  Although
surveillance did not actually see GERMOSEN and MADERA enter
ASARO's residence, every indication was that GERMOSEN and MADERA
met with ASARO at his house to deliver a kilogram of cocaine.

**32.  February 24, 2004: ROSALES, RUSCIO, and 62 Jefferson Avenue, Salem, MA**

159.  On February 24, 2004, at 1:50 p.m. ROSALES over target
telephone # 17 received a call from RUSCIO calling from Bob's
Carburetor -- 978 744-1441.  RUSCIO asked ROSALES "could you come
to the shop with a little one ("little one" referring, I believe,
to a quantity of cocaine that RUSCIO needed ROSALES to deliver to
Bob's Carburetor/Bob's Auto Sales).  I got a friend who just

---

[45]  Surveillance has seen GERMOSEN come and go from 45 Estes
Street, Everett, MA and Maria Pena is, I believe, a girlfriend of
GERMOSEN.

called who wanted one real quick." ROSALES said "Wow...I can be there in like 40 minutes." "Alright," said RUSCIO.

**33. November 11, 2003 to the Present: SACAIDA, MADERA, CHON, and others re: SACAIDA's return to Massachusetts and preparations for receipt of multi-kilogram cocaine shipment to the area.**

**350 horsepower engine**

160. On November 11, 2003, at approximately 8:20 p.m., CHON called SACAIDA in Mexico and handed the telephone to MADERA. SACAIDA told MADERA, "But the situation is, is good...cause they are going to give me a boat on credit...with a 350 horse power engine." (SACAIDA's reference to a "boat", I believe, was a coded reference to a multi-kilogram shipment of cocaine that SACAIDA had arranged with cocaine suppliers in Mexico. Narcotics traffickers often use terms such as "boat" and "truck" to refer to a shipment of narcotics. Similarly, members of the SACAIDA/MARTINEZ organization often use the term "engine" to refer to quantities of cocaine. References to large numbers (350) also presumes, I believe, that SACAIDA is discussing kilogram quantities of cocaine. SACAIDA's reference to getting the "boat on credit" is also consistent with the distribution of multiple kilogram shipments of cocaine on "credit" or consignment. As such, customers need not pay up front before taking delivery of the shipment, but, rather, must pay their debt shortly after delivery.

**The band**

135

161.  On January 8, 2004, at approximately 9:40 p.m., MADERA received a call from a Mexican male (UM). UM said, "We're going with the band over there." MADERA replied, "Okay, see, we're going to be happy now." The UM relied, "So you can start preparing the restaurants so we can take the band...we'll pay you a visit over there soon." The UM said, "the guy will be over there around the 15th" (a reference, I believe, to SACAIDA and his expected arrival in Massachusetts.) "The band" is actually a reference to the anticipated shipment of cocaine to Massachusetts. The UM's directive for MADERA to "start preparing the restaurants" is a reminder, I believe, to ready the organization's narcotics customers who will take delivery of the drugs upon their arrival. Lining up customers in advance will facilitate a quick turn around time for the drug proceeds to make their way back to Mexico.

**The climb**

162.  On January 29, 2004 at 1:08 p.m., SACAIDA called MADERA to say that he was "all ready" and that I'm going up there." (Meaning, I believe, that SACAIDA was ready to come to Massachusetts and that the anticipated shipment of drugs was on route.) SACAIDA stated that he was arriving "tomorrow...to begin the *subida* (climb)...it seems everything is fine...but I'm going to need your support ...tell the guys (drug customers) that we are ready...that we are going to be fine....the 'Coyote' already

136

brought them over and he already has them (drugs) in Chicago
...its a done deal."

**Salvador from Los Angeles**

163.   On January 30, 2004, MADERA and CHON discussed the
transfer of money (for SACAIDA's travel) from CHON to SACAIDA in
Mexico, including the name, bank, and wire transfer number
(#11611540432) under which CHON was wiring money.  SACAIDA also
reported that he was delaying his trip to make contact with an
associate - "Salvador, from Los Angeles"- and that he needed to
"wait for him a little bit."

**MARTINEZ broke**

164.   On February 3, 2004, MARTINEZ told MADERA that "so and
so" (referring to SACAIDA) was to meet with "these people"
tonight - possibly, to finalize payment and/or shipping
arrangements for the cocaine load - and for MADERA to leave his
telephone on in the event that there was more news to report from
Mexico.  MARTINEZ also told MADERA that his "resources (cash) ran
out...I'll see you in a few days."  (By this account, I believe
that Martinez is broke and needs to get back to Lynn as soon as
possible to take advantage (profit) from the anticipated arrival
and subsequent distribution of SACAIDA's cocaine load.)

**Close to the fence**

165.   On February 4, 2004, SACAIDA told MADERA that he was
"close to the fence." (Meaning, I believe, that he was at the

137

Mexico/U.S. border and getting ready to cross.) SACAIDA remarked further that he was going to meet the "guy with the white hair...we are going to meet very soon," presumably, about SACAIDA's cocaine deal. SACAIDA told MADERA to take the necessary steps to "form a team...and have everything ready...and tell them to be on the lookout." (In other words, MADERA was to alert the customer base and prepare them for, apparently, a future cocaine distribution from the organization.) MADERA replied, "I'm prepared," since SACAIDA had, during earlier calls, told him to be ready for something.

**On this side; Wire transfers**

166. On February 8, 2004, there were more calls between MADERA, SACAIDA, and CHON concerning SACAIDA's trip from Mexico to Massachusetts. On February 8, 2004, MADERA called CHON to say that "they're already on this side" – meaning, I believe, that SACAIDA was across the border and was somewhere in the American southwest. The same day, MADERA also made arrangements to wire SACAIDA $1000. MADERA used the false name "Roberto Arroyo Felix" to wire the money, and the false name "Lazaro Cepero" as the intended recipient of the funds. Later, MADERA called SACAIDA at an Arizona cellular telephone number (520 488-5469), dictated the wire number to SACAIDA (#450-295-6232), and confirmed that it would be "1 peso" or $1000.

**The *encargo***

Mexico/U.S. border and getting ready to cross.)  SACAIDA remarked

further that he was going to meet the "guy with the white

hair...we are going to meet very soon," presumably, about

SACAIDA's cocaine deal.  SACAIDA told MADERA to take the

necessary steps to "form a team...and have everything ready...and

tell them to be on the lookout."  (In other words, MADERA was to

alert the customer base and prepare them for, apparently, a

future cocaine distribution from the organization.)  MADERA

replied, "I'm prepared," since SACAIDA had, during earlier calls,

told him to be ready for something.

**On this side; Wire transfers**

166. On February 8, 2004, there were more calls between

MADERA, SACAIDA, and CHON concerning SACAIDA's trip from Mexico

to Massachusetts.  On February 8, 2004, MADERA called CHON to say

that "they're already on this side" – meaning, I believe, that

SACAIDA was across the border and was somewhere in the American

southwest.  The same day, MADERA also made arrangements to wire

SACAIDA $1000.  MADERA used the false name "Roberto Arroyo Felix"

to wire the money, and the false name "Lazaro Cepero" as the

intended recipient of the funds.  Later, MADERA called SACAIDA at

an Arizona cellular telephone number (520 488-5469), dictated the

wire number to SACAIDA (#450-295-6232), and confirmed that it

would be "1 peso" or $1000.

138

167. 



**UA flight No. 178 to Boston**

169. On February 13, 2004, SACAIDA called MADERA to say that he, Sagrario Godinez, a third person were flying to Boston and would arrive at 9:00 p.m. on United Airlines flight No. 178. Surveillance later confirmed SACAIDA's and Godinez' arrival at Boston's Logan International Airport.

**message for Adrian**



140

170.   On February 14, 2004, SACAIDA spoke with an unidentified Hispanic male, Adrian LNU. SACAIDA also told Adrian that he had "a message" for Adrian to give to "him." (No doubt, an associate of Adrian's and someone involved in the drug business.) "Tell him that I...fulfilled his orders...that the *encargo* (errand/order) is already at the place he knows...the encargo that he need me to do for him, tell him that it's already available so that...he can go do a *carne asada* (barbecue) or whatever he wants to do." "Okay, that's fine," replied Adrian. (SACAIDA's message for Adrian's associate refers, I believe, to SACAIDA's cocaine load that is nearing Massachusetts, that it has reached some undisclosed location (one known to Adrian's associate), and that the associate can perform whatever task SACAIDA assigned him to do – transport it to another location, re-package the drugs in some way, or participate, somehow, in the delivery of the shipment.)

**SACAIDA's and Guillermo's debt**

171.   On February 15, 2004, SACAIDA spoke with "Guillermo", another unidentified Hispanic male speaking from Mexico. SACAIDA spoke with Guillermo "about what we had talked about last time,"(before SACAIDA left Mexico for the United States.) SACAIDA explained, "things got difficult now...and I have to do something...so that's why I asked these people to wait for me until this month...if nothing turns up this month...then they

141

could proceed to do whatever they want." (SACAIDA, I believe, is in debt for a previous shipment of cocaine to this area that the suppliers were never paid for. SACAIDA has, therefore, asked these creditors to "wait" (for payment) until the end of February (and after delivery of SACAIDA's cocaine load) so that SACAIDA can pay them with proceeds earned from this shipment. If not, SACAIDA appears resigned that these people will take more serious action to recover the debt.)

172.  Guillermo (a partner of SACAIDA's in the prior load and facing the same debt agreed.)  "I have no problem with that at all. I didn't have anything before and I will leave without anything...what problem can I have...that's why I was telling you that I was playing with the numbers to find out what I could and could not do during the month of March." (A reference, I believe, to Guillermo exploring his own net worth to cover this debt.) SACAIDA reiterated, "...they (creditors) told me that there was no problem, that (the drug load) would be for this month...okay, that's fine...we'll see....we're (referring to the creditors) going to wait to see what the outcome is." (Again, explaining, I believe, that the payment terms negotiated with the creditors were acceptable based on receipt of the current load "this month.")

173.  Guillermo confirmed with SACAIDA that in "March" he would also know the state of his financial situation. ("well, I

142

had told them that during the month of March I would know pretty
much what I could do [financially].") Finally, Guillermo said
that he would call SACAIDA "at the end of next month when I will
have some kind of answer for you, okay?" SACAIDA replied, "okay,
but I don't have until (next) month, they told me this
month....I'll call you to inform you what arrangement I have come
to or what arrangement I haven't come to." (SACAIDA is telling
Guillermo, I believe, that the coming days and the anticipated
arrival of his cocaine load will determine how their joint debt
is resolved.)[48]

**SACAIDA negotiations with *guagua***

174. On February 16, 2004, SACAIDA told MADERA that "I'm
here negotiating the *guagua* (truck/van)..to see what we can do
to..uh...to do something, okay?" "Yes, yes," replied MADERA.
(SACAIDA's remark to MADERA about negotiating with the *guagua* –
truck or van in English – meant, I believe, that he was talking
with either the owner or driver of the vehicle that had been
hired to bring SACAIDA's cocaine load to this area from some
undisclosed location. SACAIDA's reference to negotiating with
the *guagua* suggested that he was discussing either the finances
related to the purchase of the load or, simply, compensation to

---

[48] In another part of the call, SACAIDA engages on
"gallows" humor in response to a remark by Guillermo that "we
have to pass on to the other side." "Yes I know, said SACAIDA,
"okay sir...to spend on a freaking bullet now, they are really
expensive....they cost 10 pesos each!"

be paid the driver/owner for transporting the drugs to Lynn.

## III.   **Probable Cause to arrest Target Subjects**

175. Based on the information contained in this Affidavit,
all of which is true and accurate to the best of my knowledge,
information and belief, there is probable cause to believe that
the target subjects have violated 21 U.S.C. §§ 846, and that they
knowingly and intentionally conspired with themselves to possess
with intent to distribute and to distribute cocaine, a Schedule
II controlled substance.

## IV.   **Probable Cause to search Target Locations**

176. Based on information contained in this Affidavit, there
is also probable cause to believe that evidence defined in
**Attachment C**, and relating to the illegal distribution of cocaine
in violation of 21 U.S.C. §§841(a)(1) and 846, may be found at
the Target Locations.

177.   I believe that inculpatory evidence of the Target
Subjects' drug activities may be found at the different Target
Locations based on the evidence set forth this in affidavit.
Moreover, in view of my experience as an experienced narcotics
investigator, a search of these Target Locations will, likely,
produce inculpatory evidence of the Target subjects' drug
distribution activities as well as quantities of cocaine, drug
packaging materials, and U.S. currency earned through their
illegal drug distribution efforts.   In addition, discovery of

144

wireless telephones utilized by target subjects during this investigation, including specific target telephones, written records and other documents reflecting drug distribution, identification documents bearing the Target Subjects' real (and false) identities, telephone books, Rolodexes, address books, and other lists that include the telephone numbers of suppliers, customers, and other persons and associates involved in drug distribution, financial records representing monies earned (or assets purchased) through the organization's drug distribution activities, records relating to the purchase and sale or ownership of vehicles utilized by Target Subjects in carrying out their drug activities, records evidencing the expenditure of funds obtained from drug trafficking, including bills and receipts reflecting purchases, and other documents representing illegally earned proceeds obtained from drug trafficking, including bank account records, bank books, checks, bank drafts, and other financial account information, as well as other items detailed in **Attachment C**, may also be found at Target Locations.

178.  I expect to find such items at the Target Locations because, in my experience, it is the practice of drug dealers and their close associates to maintain quantities of drugs, drug paraphanalia, U.S. currency, and financial records, ledgers, and other writings evidencing their illegal drug trafficking activities in safe, secure, and private places and locations like

145

their homes, apartments, businesses, offices, and other leased or owned locations where their privacy can be maintained.

179.  Record keeping, in particular, is critical to drug dealers in order to keep close track of monies paid and monies owed so that the drug organization can stay profitable and remain in business.  In addition, to be of help and value to a drug dealer, such records need to be maintained where they are most easily accessible and, therefore, at secure locations such as the Target Subject's home, residence, place of business or employment, or, perhaps, at some other location where that persons has either an ownership or leasehold interest.  Drug traffickers, especially those that purchase drugs on consignment, also commonly keep "pay and owe" and other day-to-day financial records that reflect balances due (suppliers) for drugs purchased, and payments expected (customers) at these same

146

locations. Such records can, frankly, only assist the drug distributor if they are accessible to him/her at the types of locations defined above.

_____
**JEAN DROUIN**
Special Agent
Drug Enforcement Administration


Sworn to and subscribed before me
this ___26___ day of February, 2004.

_____
**CHARLES B. SWARTWOOD, III**
United States Magistrate Judge

147